UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GEMINI MASTER FUND, LTD. AND BLACK MOUNTAIN EQUITIES, INC., | Civil Action No. 15-cv-3378 (WHP) |
| Plaintiffs, | |
| -against- | |
| ELECTRONIC CIGARETTES INTERNATIONAL GROUP, LTD, | |
| Defendant. | |

**DEFENDANT'S MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY JUDGMENT**

ROBINSON BROG LEINWAND
GREENE GENOVESE & GLUCK, P.C.
*Attorneys for Defendant*
875 Third Avenue, 9th Floor
New York, New York 10022
212-603-6300

## TABLE OF CONTENTS

PRELIMINARY STATEMENT...............................................................................1

STATEMENT OF FACTS..................................................................................1

STANDARD OF REVIEW..................................................................................1

ARGUMENT....................................................................................................2

POINT I

SUMMARY JUDGMENT SHOULD BE DENIED AS THERE ARE MATERIAL
FACTS IN DISPUTE AS TO WHETHER PLAINTIFFS WERE IN POSSESSION OF
MATERIAL NONPUBLIC INFORMATION WHICH PROHIBITED THEM FROM
TRADING........................................................................................................2

    A. Plaintiffs Cannot State a Valid Cause of Action for Breach of Contract As They
    Were Barred from Trading During the Period Prior to the Delivery of Their
    Shares...................................................................................................2

        1. The Parties' Versions of the Material Facts Concerning the Information Provided
        to Plaintiffs Are in Dispute...........................................................4

        2. Plaintiffs Had a Duty to refrain From Trading Until the Recapitalization Was
        Publicly Disclosed......................................................................10

    B. Regulation "FD" Does Not Bar Plaintiffs' Claim.....................................13

POINT II

PLAINTIFFS WAIVED THEIR RIGHT TO TIMELY RECEIVE SHARES............15

POINT III

PLAINTIFFS MISCALCULATED THE VALUE OF THEIR LIQUIDATED
DAMAGES.....................................................................................................16

    A. Plaintiffs Argument Attempts to Collect Liquidated Damages for Shares They
    Were Never Entitled to Receive......................................................................17

    B. Plaintiffs Calculated Their Damages Based on an Improper VWAP.............17

CONCLUSION................................................................................................20

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)...........................................5

*Celotex Corp. v. Catrett*,
477 U.S. 317, 106 S. Ct. 2548 (1986) ........................................................5

*In re Cendant Corp. Sec. Litig.*,
181 Fed. Appx. 206, 2006 U.S. App. LEXIS 12195 (3d Cir. 2006) .......................16

*Davidowitz v. Patridge*,
2010 U.S. Dist. LEXIS 132762, 2010 WL 5186803 (S.D.N.Y. Dec. 6, 2010)................20, 21

*Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*,
7 N.Y.3d 96, 817 N.Y.S.2d 606 (2006)........................................................18

*Jefpaul Garage Corp. v. Presbyterian Hosp. in N.Y.*,
61 N.Y.2d 442, 474 N.Y.S.2d 458 (1984)....................................................19

*Key Energy Servs. v. Eustace*,
290 S.W.3d 332, 2009 Tex. App. LEXIS 2970 (Tex. App. Eastland 2009) ...........17

*Lucente v. IBM*,
310 F.3d 243 (2d Cir. 2002) ....................................................................5

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574, 106 S. Ct. 1348 (1986) ........................................................5

*MBIA Ins. Corp. v. Royal Bank of Can.*,
28 Misc. 3d 1225(A), 958 N.Y.S.2d 62 (N.Y. Sup. Ct. 2010) ...........................7, 16

*Rodriguez v. City of New York*,
72 F.3d 1051 (2d Cir. N.Y. 1995) .............................................................10

*SEC v. Cuban*,
2013 U.S. Dist. LEXIS 30324, 2013 WL 791405 (N.D. Tex. Mar. 5, 2013)..........15

*SEC v. DCI Telecomms.*,
122 F. Supp. 2d 495 (S.D.N.Y. 2000) ........................................................16

*SEC v. Grossman*,
1987 U.S. Dist. LEXIS 1666 (S.D.N.Y. Feb. 17, 1987).....................................16

*SEC v. Koenig,*
    1972 U.S. Dist. LEXIS 13163 (S.D.N.Y. 1972) ...................................................................16

*SEC v. Siebel Sys.,*
    384 F. Supp. 2d 694 (S.D.N.Y. 2005) ......................................................................17

*United States v. Chestman,*
    947 F.2d 551 (2d Cir. 1991) ...................................................................................14

*United States v. Corbin,*
    729 F. Supp. 2d 607 (S.D.N.Y. 2010) ....................................................................14

*United States v. Newman,*
    773 F. 3d 438 (2d Cir. 2014) .....................................................................................6

*United States v. O'Hagan,*
    521 U.S. 642, 117 S. Ct. 2199 (1997) .......................................................................6

*Vital v. Interfaith Med. Ctr.,*
    168 F.3d 615 (2d Cir. 1999) ......................................................................................9

**Statutes**

Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C.A. §78j(b) .....................6, 14, 16

Regulation FD, C.F.R. § 243.100.......................................................................................13,14

**Other Authorities**

Fed. R. Civ. P. 56(c).............................................................................................................1

http://www.sec.gov/divisions/corpfin/guidance/regfd-interp.htm..................................................17

SEC Rule 10b-5, 17 C.F.R. 240.10b-5....................................................................................2

## PRELIMINARY STATEMENT

Defendant Electronic Cigarettes International Group, Ltd., ("ECIG"), by its attorneys, submits this memorandum of law in opposition to the motion for summary judgment made by Plaintiffs.   As is discussed below, summary judgment at this early stage of the case is inappropriate given the sharp factual disputes between the parties concerning such important issues as: (i) whether any material nonpublic information was provided to Plaintiffs in the due diligence call conducted by Plaintiffs with ECIG's chief financial officer, (ii) the impact of such information on Plaintiffs' ability to trade ECIG shares during the brief delay in the delivery of shares to them, (iii) whether Plaintiffs waived their right to the delivery of shares within five days of their exercise of warrants when they were informed by ECIG that it had insufficient authorized and unissued shares pending a reverse stock split, and (iv) even if Plaintiffs were entitled to liquidated damages, whether their calculation of such damages is accurate.

## STATEMENT OF FACTS

ECIG, for the sake of brevity, refers the Court to the Declaration of Phil Anderson, dated October 21, 2015 ("*Anderson Decl.*") and the Declaration of Lawrence Hirsh, dated October 21, 2015 ("*Hirsh Decl.*") for a recitation of the facts.   The relevant facts will be repeated herein as necessary.

## STANDARD OF REVIEW

"Summary judgment is appropriate only 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits . . . show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Lucente v. IBM*, 310 F.3d 243, 253, (2d Cir. 2002) (quoting Fed. R. Civ. P. 56(c)).  *Accord, Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986). "The party seeking summary judgment has the burden to demonstrate that no genuine issue of material

fact exists." *Lucente*, 310 F.3d at 253.   When determining whether there is a material issue of

fact, the evidence must be considered in the light most favorable to, and all inferences must be

drawn in favor of, the nonmovant.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 587, 106 S. Ct. 1348, 1356 (1986).   That is, "the evidence of the non-movant is to be

believed." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505

(1986). "In deciding a motion for summary judgment, the district court's function is not to weigh

the evidence or resolve issues of fact; it is confined to deciding whether a rational juror could

find in favor of the non-moving party." *Lucente*, 310 F.3d at 254.   "Therefore, summary

judgment is improper if there is any evidence in the record that could reasonably support a jury's

verdict for the non-moving party." *Id.*

## ARGUMENT

### POINT I

**SUMMARY JUDGMENT SHOULD BE DENIED AS THERE ARE MATERIAL
FACTS IN DISPUTE AS TO WHETHER PLAINTIFFS WERE IN POSSESSION OF
MATERIAL NONPUBLIC INFORMATION WHICH PROHIBITED THEM FROM
TRADING**

#### A. Plaintiffs Cannot State a Valid Cause of Action for Breach of Contract As They Were Barred from Trading During the Period Prior to the Delivery of Their Shares

Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C.A.

§78j(b), and Rule 10b-5 promulgated thereunder, prohibit the trading in a corporation's securities

on the basis of material, nonpublic information about the corporation by corporate insiders such

as an officer or director.   The scope of insider trading liability is expanded to certain "outsiders"

who do not have any fiduciary or other relationship to a corporation or its shareholders, under an

"alternative, but overlapping theory of insider trading liability," called the misappropriation

theory. *See United States v. Newman*, 773 F. 3d 438 (2d Cir. 2014) *cert. denied United States v.*

2

*Newman*, 2015 U.S. LEXIS 6104 (U.S. Oct. 5, 2015).  As described by the Supreme Court in

*United States v. O'Hagan*, 521 U.S. 642, 652, 117 S. Ct. 2199, 2207 (1997):

> "The 'misappropriation theory' holds that a person commits fraud 'in connection with' a securities transaction, and thereby violates § 10(b) and Rule 10b-5, when he misappropriates confidential information for securities trading purposes, in breach of a duty owed to the source of the information . . . . Under this theory, a fiduciary's undisclosed, self-serving use of a principal's information to purchase or sell securities, in breach of a duty of loyalty and confidentiality, defrauds the principal of the exclusive use of that information. In lieu of premising liability on a fiduciary relationship between company insider and purchaser or seller of the company's stock, the misappropriation theory premises liability on a fiduciary-turned-trader's deception of those who entrusted him with access to confidential information."

*Id.*

In ECIG's Answer, ¶¶ 35–38, ECIG alleges as a Third Affirmative Defense that Plaintiffs'

claims for breach of contract are barred by the fact that they were in possession of confidential,

nonpublic, material information about ECIG and, therefore, they could not have traded out of

ECIG's stock between the March 10 Warrant Share Delivery Date[1] and March 26, when the

shares were delivered to Plaintiffs (the "Delay Period") and cannot have suffered any damages.

Absent any damages, Plaintiffs cannot sustain a cause of action for breach of contract.  *See MBIA*

*Ins. Corp. v. Royal Bank of Can.*, 28 Misc. 3d 1225(A), 1225A, 958 N.Y.S.2d 62, 62, 2010 NY

Slip Op 51490(U), 28 (N.Y. Sup. Ct. 2010) ("The elements of a claim for breach of contract are

(1) the existence of a contract, (2) due performance of the contract by plaintiff, (3) breach of the

contract by defendant, and (4) damages resulting from the breach.").

---

[1] The warrants acquired by Plaintiffs (Winters Dec. Ex. 2 and Baker Dec. Ex. 2) define the "Warrant Share Delivery Date" as the date by which ECIG agreed to transmit the shares to the Warrant holder, no later than three days from delivery of the Notice of Exercise.

3

In Plaintiffs' brief in support of their motion for summary judgment, Plaintiffs argue that: (i) the confidential information they possessed, if any, was disclosed by ECIG to the market prior to the date they exercised their warrants, and (2) in any case, they were under no duty to keep any information received from ECIG confidential or to refrain from trading while in possession of it. (Plaintiffs' Brief at 12-14). It is now apparent from the limited discovery conducted to date, however, that the parties cannot even agree as to the substance of the information ECIG provided to Plaintiffs prior to their acquisition of the warrants, much less the legal effect of such information being in the hands of Plaintiffs. Summary judgment is, therefore, utterly inappropriate at this early stage of the action.

1.  The Parties' Versions of the Material Facts Concerning the Information Provided to Plaintiffs Are in Dispute

As alleged by ECIG in its Answer, ¶¶ 30-36, in or about early February, 2015 (we now know the call occurred on February 18, 2015), at the time Plaintiffs were contemplating purchasing ECIG warrants in the secondary market, Adam W. Baker ("Baker"), president of plaintiff Black Mountain Equities, Inc. ("BME") and Steven Winters ("Winters"), president of plaintiff Gemini Master Fund, Ltd. ("Gemini"), had a telephone call with Phil Anderson ("Anderson"), ECIG's chief financial officer, to discuss ECIG's operations (the "Call"). ECIG alleges that during that call, Anderson informed Winters and Baker that ECIG did not possess enough shares of common stock to make a timely delivery to Plaintiffs in the event that they exercised the warrants they were contemplating acquiring. ECIG further alleges that in response to questions posed by Baker and Winters, Anderson imparted material nonpublic information to Plaintiffs about ECIG's contemplated financing plans, and that Baker and Winters knew the information imparted to them during the call was nonpublic information, which barred them from selling ECIG shares prior to the information becoming public.

4

In their declarations submitted in support of Plaintiffs' motion for summary judgment, neither Winters nor Baker discuss the Call at all, or contest any facts underlying ECIG's Third Affirmative Defense. In Plaintiffs' brief, however, they argue that they did not receive material non-public information from ECIG, or if they did, the information was publicly disclosed by ECIG before the Warrant Share Delivery Date. (Plaintiffs' Brief at 12). Plaintiffs contend that the information that Anderson provided must have been the same information contained in proxy material ECIG filed on January 27, 2015 for a shareholders meeting scheduled for March 10, 2015, seeking authority for a reverse stock split and an increase in the number of authorized shares, or in a Form 8-K filed on March 4, 2015, disclosing a $3 million capital raise.[2] Plaintiffs are incorrect.

The information that was provided by Anderson to Plaintiffs in the February 18 due diligence Call was not the information disclosed in ECIG's January 27 and March 4 filings, which Plaintiffs already knew by the time of the Call. Had Plaintiffs taken the deposition of Anderson prior to making their motion for summary judgment, which they have not, they would know that the information Anderson provided in response to Plaintiffs' questions during the Call concerned a separate, major recapitalization of ECIG, which was then being negotiated. *Anderson Decl.* ¶ ¶ 6-7, 38; Ex. A. The recapitalization transaction, which closed on April 27, 2015, was not publicly disclosed by ECIG until the filing of a Form 8-K on May 1, 2015, well after March 26, 2015, the date on which ECIG delivered the shares to Plaintiffs for their exercise of the warrants. *Anderson Decl.* ¶¶ 38-40 and Ex. G.

Following the filing of the motion for summary judgment, ECIG noticed the depositions of Winters and Baker, which were taken on October 6, 2015. The transcripts of the depositions

---

[2] The January 27, 2015 proxy material and the March 4, 2015 Form 8-K referred to in Plaintiffs' brief are attached to their attorney's declaration submitted with the motion (Fleming Dec, Exs. 1 and 2).

are annexed to the *Hirsh Decl.* as Exhibits A and B, respectively.  As is discussed below and in the *Anderson Decl.*, Plaintiffs' version of the Call with Anderson is diametrically opposed to Anderson's description of the Call in important respects and, we submit, not credible.  Among other things, Plaintiffs deny being provided with any information about the reorganization then being contemplated by ECIG.  They persist in arguing that the information they were provided during the Call concerned the reverse stock split and the $3 million capital raise, which were the subjects of the filed proxy material and the March 4, 2015 Form 8-K, notwithstanding that they already knew those facts when they made the Call.  (Plaintiffs' Brief at 12-14).

Accordingly, there is a fundamental disagreement as to basic facts concerning the confidential information ECIG contends it provided to Plaintiffs during the Call, which alone mandates the denial of Plaintiffs' summary judgment motion.  *Vital v. Interfaith Med. Ctr.*, 168 F.3d 615, 622 (2d Cir. 1999) (reversing the district court, in part because, *inter alia*, the "[a]ssessment[] of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment.'" (quoting *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996)); *Rodriguez v. City of New York*, 72 F.3d 1051, 1063, (2d Cir. N.Y. 1995) (ruling that the district court acted improperly on summary judgment by crediting one doctor's testimony over another's).

In his declaration, Anderson recounts in detail the substance of the February 18, 2015 Call placed by Plaintiffs' Baker and Winters to Anderson.  The relevant facts, which are controverted in numerous respects by Winters and Baker in their depositions, are as follows.

On February 15, 2015 Anderson received an e-mail from Brad Richmond ("Richmond") of Newport Securities LLC ("Newport"), an investor in ECIG, who informed him that Baker was a principal of BME and wanted to ask Anderson certain questions before purchasing ECIG

warrants on the secondary market. *Anderson Decl.* ¶ 17; Ex. C.     The following day, February 18, 2015, Baker travelled to Winters' office — a twenty-five minute drive — specifically to participate in the Call. *Hirsh Decl.* Ex. B at 36:3-20.   Winters and Baker called Anderson together. *Id.* at 33:13-15.  Winters led the Call. *Anderson Decl.* ¶ 21.  During the Call, Plaintiffs informed Anderson that BME and Gemini were considering purchasing warrants issued by ECIG and were in the process of performing due diligence. *Anderson Decl.* ¶ 19.

At the time of the Call, ECIG had been experiencing financial hardships and required a large capital infusion to survive. *Anderson Decl.* ¶¶ 5-6. On account of these financial issues, Anderson was then in the process of negotiating a very substantial recapitalization transaction with a private equity firm called Metropolitan Equity Partners ("Metropolitan"), pursuant to which Metropolitan would inject substantial sums in excess of $28 million into ECIG to improve its balance sheet (the "Recapitalization"). *Anderson Decl.* Ex. A.  At the same time, Anderson was negotiating with another investor, Calm Waters Partnership ("Calm Waters"), for a significant bridge loan (the "Bridge Loan"). *Id.* ¶¶ 6-7.    Although Metropolitan failed to consummate the deal, Calm Waters eventually provided the necessary funding under nearly identical terms based upon their past dealings with ECIG.  *Id.* at ¶ 7.

As a condition to the Recapitalization, ECIG was contacting ECIG investors to negotiate the elimination of various anti-dilution provisions, including so-called ratchet provisions, which automatically adjust the price at which a warrant holder is entitled to purchase shares from an issuer such as ECIG in the event that the issuer issues shares to other investors at a lower price. *Anderson Decl.* ¶¶ 9-10.  At the time of the Call, Winters and Baker were already aware that ECIG was engaged in the process of obtaining approval to perform a reverse stock split (the "Reverse Split") and for the authorization of 50 million additional shares (the "Additional

Authorization"). *Hirsh Decl.* Ex. A at 41:9-20; Ex. B 31:1-16. Winters inquired when the Reverse Split and Additional Authorization would be complete. *Anderson Decl.* ¶ 23. Anderson responded that the authorization process was ongoing and that absent the approval of those transactions, ECIG did not possess sufficient authorized shares to meet the terms of the warrants Plaintiffs were acquiring. *Id.* Winters then told Anderson that the lack of available shares to satisfy the warrants was immaterial to Plaintiffs as they did not intend to trade their shares. *Id.* at ¶ 24. Instead, Winters said that Plaintiffs intended to hold their warrants and trade on the warrants' volatility. *Id.* Anderson told them that the strategy they described was impossible in his view, because the warrants were not publicly traded. *Id.* Winters responded "don't worry about it, we know how to do it." *Id.* Anderson understood Plaintiffs' comments to be an implicit agreement not to trade ECIG's shares. *Anderson Decl.* ¶ 30.

Winters next inquired about the possibility of Plaintiffs purchasing ECIG's senior secured debt and potentially investing in ECIG. *Anderson Decl.* ¶ 25. In response, Anderson said that he would put Plaintiffs in touch with the holders of ECIG's debt. *Id.* at ¶ 26. He further stated that Plaintiffs had called at an opportune time, because ECIG was in the midst of the Recapitalization, which would result in a restructuring of ECIG's entire balance sheet. *Id.* Winters proceeded to ask Anderson for more information about the Recapitalization, indicating that Plaintiffs might be interested in participating in the investment. *Id.* at ¶ 27. Anderson, under the belief that Plaintiffs had no intention of exercising the warrants and attempting to trade ECIG's shares (because Winters said they would not be doing so) felt comfortable telling Winters and Baker that the Recapitalization would be structured as a senior secured loan, payable in cash, with 12% interest, and that the number of warrants that would be made available to the investors was yet to be determined. *Id.* Anderson disclosed this information to Winters

and Baker with the understanding that, as experienced investors, they understood that the information was nonpublic and that they were being brought "over the wall," meaning that they could not trade ECIG shares until the information became public. *Anderson Decl.*, ¶¶ 28-29.

Ultimately, the Recapitalization was provided by Calm Waters, the investment entity which had previously agreed to the Bridge Loan, rather than Metropolitan. *Id.* at ¶ 38. The amount invested by Calm Waters was $35 million in the form of senior secured debt, and the Recapitalization transaction was completed on April 27, 2015 and announced by the public filing of a Form 8-K on May 1, 2015. *Anderson Decl.* ¶¶ 38-39 and Ex. G.

At their depositions, Baker and Anderson failed to recall the particulars of the Call beyond their alleged request to receive reissued warrants. *See generally, Hirsh Decl.* Ex. A; *Hirsh Decl.* Ex. B. They denied being provided with any nonpublic information, including about the Recapitalization.   Substantial documentary evidence exchanged in discovery, however, supports Anderson's recollection of the Call.   For instance, after the call, Winters e-mailed Anderson and specifically asked if he could speak with the holders of ECIG's senior secured debt. *Anderson Decl.* Ex. D.   This e-mail confirms Anderson's recollection that Plaintiffs requested information on ECIG's senior secured debt during the Call.

Additional evidence supports Anderson's assertion that he and Plaintiffs discussed the elimination of anti-dilution provisions from the warrants, including the ratchets, as an element of ECIG's ability to accomplish the Recapitalization, and ECIG's inability to provide Plaintiffs sufficient shares of common stock in the event that Plaintiffs exercised their warrants. On March 4, 2015, just before Plaintiffs exercised their warrants, Winters again e-mailed Anderson (and Baker) and proposed "a fair compromise to do away with the ratchet now . . . ." *Anderson Decl.* Ex. E.   Winters' proposed "compromise" is obviously a reference to Anderson's previous

disclosure of ECIG's need to eliminate the warrants' ratchet provisions in support of the pending Recapitalization. The language used by Winters in the e-mail indicates that the topic had previously been discussed between them. There is no other plausible explanation for Winters' offer and the way he phrased it. [3]

In the same e-mail, Winters stated that "if [ECIG's] stock continues to go higher, Gemini has an incentive **not** to exercise [its warrants] and should wait to see if an even higher VWAP occurs the next day. I understand that this is not very helpful for your situation."[4] *Anderson Decl.* Ex. E. The "situation" referred to by Winters in the event of an increasing VWAP is obviously ECIG's inability to timely issue the requisite shares required by the warrants as the VWAP became ever more favorable to Plaintiffs in the event of a cashless exercise.

Based on the foregoing, the limited discovery conducted to date supports the view that Plaintiffs had actual knowledge that: (1) ECIG was then incapable of complying with the terms of the warrants; and (2) ECIG was engaged in the Recapitalization.

### 2. Plaintiffs Had a Duty to Refrain From Trading Until the Recapitalization Was Publicly Disclosed

Plaintiffs argue that they were under no duty to keep the information confidential or to refrain from trading. (Plaintiffs' Brief at 12-14). Their argument is incorrect as they ignore their implicit agreement to respect the confidential nature of the information obtained from Anderson and their representation to him that they had no intention of trading ECIG shares in the short term. *Id.*

---

[3] Winters' testimony at his deposition that his proposed "compromise" was based on general principles of business is not credible. *See Hirsh Decl.* Ex. A at 45:22-52:16. Winters would have this Court believe that, out of the blue, he offered to eliminate the warrants' ratchet provisions, which protected Gemini's financial position. It is much more credible that Anderson disclosed his desire to eliminate ratchets in the warrants in connection with the Recapitalization ECIG was pursuing.

[4] Based upon the formulas contained in the Warrants, the higher the VWAP on the date of exercise, the more shares Plaintiffs would retain when engaging in the cashless exercise. In other words, as ECIG's stock price increased, ECIG would be forced to issue Plaintiffs more shares in the event of an exercise.

A duty of confidentiality and to refrain from trading "arises from the relationship between parties and not merely from one's ability to acquire information because of his position in the market." *United States v. Corbin*, 729 F. Supp. 2d 607, 612 (S.D.N.Y. 2010) (quoting, *Chiarella v. United States*, 445 U.S. 222, n. 14, 231, 100 S. Ct. 1108, 1116 (1980). The "central inquiry" under the misappropriation theory is what constitutes a fiduciary or similar relationship of trust and confidence sufficient to give rise to a duty in the context of Rule 10b-5. *United States v. Chestman*, 947 F.2d 551, 567 (2d Cir. 1991). Such a duty can arise from an express agreement, a classic fiduciary relationship, or from "a relationship of trust and confidence [that is] the functional equivalent of a fiduciary relationship." *Corbin*, 729 F. Supp. at 614 (quoting *Chestman*, 947 F.2d at 568). An implied duty to maintain confidentiality and to refrain from trading may be created where one party gives the other reason to believe that it does not intend to trade on information it was provided during its solicitation as a potential investor. *SEC v. Cuban*, 2013 U.S. Dist. LEXIS 30324, 2013 WL 791405 (N.D. Tex. Mar. 5, 2013).

Summary judgment should be denied where there is a question of fact concerning whether the parties intended their discussions to be confidential and to restrict trading. Such a circumstance arose in *SEC v. Cuban*, 2013 U.S. Dist. LEXIS 30324, 2013 WL 791405 (N.D. Tex. Mar. 5, 2013), where a Northern District of Texas court denied a motion for summary judgment made by the defendant, Mark Cuban, seeking to dismiss securities fraud claims brought against him on a misappropriation theory, holding that a reasonable jury could find that Cuban agreed to maintain the confidentiality of information provided to him. In reaching its decision, the court noted that based upon the context of the parties' discussions about a proposed private investment in public equity ("PIPE") by Mamma.com, Cuban acknowledged his inability to trade his shares in the company after learning of the PIPE transaction. Thereafter, Cuban

"requested more information from Mamma.com about the PIPE . . . ." *Id.* at 16. From these facts, the court reasoned that Cuban "and Mamma.com implicitly agreed that Mamma.com would only provide him information about the terms and conditions of the PIPE 'for the purpose of evaluating whether he would participate in the offering, and that Cuban could not use the information for his own personal benefit.'" *Id.* at 16-17. The court concluded, "[v]iewing the summary judgment evidence in the light most favorable to the [plaintiff] as the . . . nonmovant, there is a genuine issue of fact whether Cuban agreed at least implicitly to refrain from trading on or otherwise using for his own benefit the nonpublic PIPE information." *Id.* at *17.

Like *Cuban*, in this case there is a question of fact concerning whether Plaintiffs agreed implicitly to not trade their shares when, after indicating their interest in investing further in ECIG, they acquired information about the Recapitalization. Just as Cuban acknowledged that he could not trade his shares as a result of being told of the proposed PIPE, Winters and Baker told Anderson that they would not trade their shares. *Anderson Decl.* ¶¶ 24, 29-30. Indeed, Plaintiffs acknowledged during the Call that they were not even concerned with whether ECIG had sufficient shares to honor the exercise of the warrants as they had no intention of trading shares. *Id.* at ¶ 24. Based on the foregoing, a reasonable jury could find that the parties' implicitly agreed to maintain the confidentiality of the information about the Reorganization provided to them during the Call and to refrain from trading ECIG  shares until the Reorganization was publicly announced. Had they traded while in possession of such inside information, they would have run afoul of the misappropriation theory of insider trading.[5]

---

[5] There is no question that the information concerning the Reorganization was material. Information is considered material when "'there is a substantial likelihood that a reasonable shareholder would consider it important . . . .'" *SEC v. DCI Telecomms.*, 122 F. Supp. 2d 495, (S.D.N.Y. 2000) (quoting *Basic, Inc. v. Levinson*, 485 U.S. 224, 232, 108 S. Ct. 978, 983 (1988)). Any reasonable investor would consider a $35 million recapitalization important when making trading decisions, especially in the context of ECIG's overall balance sheet, which as of September 30, 2014 (the latest available financial statements of the Call), showed net worth of $157 million. *Hirsh Decl.* Ex. C. See *SEC v. Grossman*, 1987 U.S. Dist. LEXIS 1666, *31 (S.D.N.Y. Feb. 17, 1987) ("Information regarding a . . .

In sum, ECIG has demonstrated that there is at least an issue of fact concerning whether Plaintiffs would have been prohibited from trading their shares under Rule 10b-5 had ECIG timely delivered them.  On the facts set forth by Anderson in his declaration and the exhibits annexed thereto, even if Plaintiffs had received their shares on the date specified in the warrants, they would have been prohibited from trading until well after the date they actually received their shares from ECIG.  As a result, Plaintiffs are unable to demonstrate any damages and their motion for summary judgment should be denied.  *MBIA Ins. Corp.*, 28 Misc. 3d 1225A, 958 N.Y.S.2d 62.   *See also In re Cendant Corp. Sec. Litig.*, 181 Fed. Appx. 206, 2006 U.S. App. LEXIS 12195 (3d Cir. 2006) (the defendant's failure to timely convey stock after the exercise of a stock option by the plaintiff did not result in any damages because the plaintiff was barred from trading under federal law); *Key Energy Servs. v. Eustace*, 290 S.W.3d 332, 344, 2009 Tex. App. LEXIS 2970, *29 (Tex. App. Eastland 2009) ("Because any stock option exercise would be a prohibited securities transaction, [defendant] is correct that any damage claim for lost options is barred as a matter of law.")

## B.  Regulation "FD" Does Not Bar Plaintiffs' Claim

Plaintiffs next argue that if ECIG imparted material, nonpublic information to Plaintiffs, ECIG would have violated Regulation FD ("Fair Disclosure")[6] by not promptly publicly disclosing the same information.  (Plaintiffs' Brief at 14).   This argument fails because it misconstrues the requirements of Regulation FD and its exceptions.

"Regulation FD is aimed at prohibiting the selective disclosure of information, in order to promote the full and fair disclosure of information to the public."  *SEC v. Siebel Sys.*, 384 F.

---

recapitalization is inherently material. Without question, a reasonable investor would regard such information as significantly altering the 'total mix' of information made available."); *SEC v. Koenig*, 1972 U.S. Dist. LEXIS 13163 (S.D.N.Y. 1972) (finding a recapitalization to be a material fact).
[6] *See* 17 C.F.R. § 243.100.

Supp. 2d 694, 700 (S.D.N.Y. 2005).   Pursuant to Question 101.11 in the Compliance and Disclosure Interpretations ("C&DIs"), published by the staff of the SEC, Regulation FD does not prohibit an issuer's directors from speaking privately with the holder of securities, provided the director does not disclose material nonpublic information to such shareholder or shareholders under circumstances in which *it is reasonably foreseeable that the shareholder will trade the issuer's securities on the basis of such information.*[7]   *Siebel Sys.*, 384 F. Supp. 2d at 696. (Regulation FD only requires public disclosure if "market professionals or holders of the issuer's securities . . . are reasonably likely to trade on the basis of that [privately disclosed] information.").

The solicitation of potential investors is not what Regulation FD was designed to discourage. *Id.* at 694 (considering the purpose of Regulation FD before ruling on liability for an alleged violation).   Requiring public disclosure of potential investments and their terms would hamper a company's ability to raise capital.  Such disclosures would arguably be contrary to the goal of promoting "the full and fair disclosure of information to the public," and would instead confuse the public as to whether an issuer may acquire funding, which may never comes to fruition.

Critically, here it was not reasonably foreseeable to ECIG that Plaintiffs would trade on the basis of the information provided by Anderson.   To the contrary, immediately prior to disclosing the nonpublic, material information to Plaintiffs, they assured Anderson that they had no interest in trading ECIG's shares. *Anderson Decl.* ¶¶ 24, 30.

---

[7] http://www.sec.gov/divisions/corpfin/guidance/regfd-interp.htm

## POINT II

## <u>PLAINTIFFS WAIVED THEIR RIGHT TO TIMELY RECEIVE SHARES</u>

Plaintiffs waived their right to the timely receipt of the shares due on the exercise of the warrants they acquired when they discovered that ECIG lacked sufficient authorized shares to issue warrants prior to the approval of the Reverse Split and Additional Authorization, represented to Anderson that they were not going to exercise the warrants in the short term, and purchased the warrants armed with such knowledge.

A waiver is an intentional abandonment or relinquishment of a known right which, but for such waiver, a party would have enjoyed. *Excel Graphics Techs., Inc. v. CFG/AGSCB 75 Ninth Ave.*, L.L.C., 1 A.D.3d 65, 69, 767 N.Y.S.2d 99, 103 (1st Dep't 2003). A waiver may be implied by "'affirmative conduct or by failure to act so as to evince an intent not to claim a purported advantage.'" *Fundamental Portfolio Advisors, Inc. v. Tocqueville Asset Mgmt., L.P.*, 7 N.Y.3d 96, 104, 817 N.Y.S.2d 606, 611 (2006) (quoting, *GM Acceptance Corp. v. Clifton-Fine Cent. Sch. Dist.*, 85 N.Y.2d 232, 236, 623 N.Y.S.2d 821, 823 (1995)). Generally, whether a party has waived a right is question of fact. *Jefpaul Garage Corp. v. Presbyterian Hosp. in N.Y.*, 61 N.Y.2d 442, 446, 474 N.Y.S.2d 458, 459 (1984).

There is at least a question of fact concerning whether Plaintiffs intended to waive their right to timely receive stock upon exercise of the warrants. There is no dispute that Plaintiffs were aware of their right to receive their shares within five days of exercise of the warrants. Plaintiffs, however, demonstrated their intent to waive their right by: (i) inquiring when the Reverse Split and Additional Authorization would be complete (*Anderson Decl.* ¶ 23) (ii) obtaining actual knowledge from Anderson that ECIG could not fulfill the terms of the warrants before the Reverse Split and Additional Authorization were complete (*id.*); and (iii) informing

Anderson that they had no intent to exercise the warrants or trade ECIG's shares but merely intended to trade on the warrants' volatility. *Id.* at ¶ 30.

Plaintiffs' argument that ECIG had sufficient shares available and simply chose not to honor the terms of the warrants is incorrect. (Plaintiffs' Brief at 15). Although Plaintiffs are correct that, as of the January 27, 2015 Proxy Statement calling for a special meeting of stockholders on March 10, 2015 for approval of the Reverse Split and Additional Authorization, ECIG had 53,601,332 authorized, unissued shares remaining, that number quickly dwindled in the face of extensive warrant exercises at ever more favorable conversion prices to the investors over the ensuing weeks. *Anderson Decl.* Ex. B. Indeed, by the February 8, 2015 Call, ECIG had issued 298,968,651 of its 300,000,000 authorized shares, leaving only 1,031,349 unissued shares. *Id.* There is no basis in fact for Plaintiffs' contention that ECIG simply decided not to make timely delivery of shares to Plaintiffs.

## POINT III

## PLAINTIFFS MISCALCULATED THE VALUE OF THEIR LIQUIDATED DAMAGES

Assuming, *arguendo*, that Plaintiffs have a viable breach of contract claim despite the fact that Rule 10(b) prevented them from trading, Plaintiffs still failed to properly calculate their damages. First, Plaintiffs incorrectly calculated the number of shares they were respectively entitled to. In particular, BME claims it was entitled to liquidated damages on 14,051,542 shares. In reality, BME was never entitled to receive more than 12,157,606 shares after on the cashless exercise. *Baker Decl.* ¶ 6. Gemini claims it was entitled to liquidated damages on 10,029,099 shares. In reality, Gemini was never entitled to receive more than 8,677,327 shares after the cashless exercise. *Winters Decl.* ¶ 6. Second, Plaintiffs applied the variable weighted adjusted price ("VWAP") for a cashless exercise rather than the VWAP for the liquidated damages calculation, rendering their calculation incorrect.

### A. Plaintiffs Argument Attempts to Collect Liquidated Damages for Shares They Were Never Entitled to Receive

Plaintiffs' liquidated damage calculation is wrong first and foremost because it attempts to recover liquidated damages on shares they would never receive. Plaintiffs can only receive damages for shares they would receive after the cashless exercise. *See Davidowitz v. Patridge*, 2010 U.S. Dist. LEXIS 132762, *34, Fn. 12, 2010 WL 5186803 (S.D.N.Y. Dec. 6, 2010) (awarding damages on only those shares plaintiff would have received in a breach of contract action for failure to deliver shares of common stock pursuant to an option agreement where plaintiff was entitled to purchase 4,000,000 shares of common stock but would only receive 3,961,880 shares after a cashless exercise). Therefore, the number of shares BME and Gemini were entitled to must be reduced by 1,893,936 shares and 1,351,772 before Plaintiffs' liquidated damages can be calculated.

Inexplicably, Plaintiffs calculate their liquidated damages on the total number of shares the warrants permitted them to receive in the event of a cash exercise. (Plaintiffs' Brief at 4). By calculating their damages on the total number of shares authorized by the warrants, Plaintiffs essentially claim they were damaged by cashlessly "paying" for their shares—a decision made at Plaintiffs' sole election. Pursuant to *Davidowitz*, Plaintiffs are only entitled to damages, if any, on the net shares of common stock they were entitled to receive after the cashless exercise.

### B. Plaintiffs Calculated Their Damages Based on an Improper VWAP

In addition to calculating their damages based on the wrong number of shares, Plaintiffs also applied a VWAP from the wrong date, substantially increasing their damages. The VWAP—or variable weighted average price—essentially sets a strike price to acquire shares of common stock. Plaintiffs contend that they exercised their warrants on March 5, 2015. *Winters Decl.* ¶ 6; *Winters Decl.* Ex. 3; *Baker Decl.* ¶ 6. *Baker Decl.* Ex. 3. Plaintiffs further contend

that the applicable VWAP is $.1814.  *Winters Decl.* ¶ 6; *Winters Decl.* Ex. 3; *Baker Decl.* ¶ 6.
*Baker Decl.* Ex. 3.  Plaintiffs, however, used the wrong VWAP and failed to provide evidence of
the proper VWAP.

The VWAP to be employed when converting shares under the cashless formula requires
the parties to use the VWAP from the day before the exercise, or March 4, 2015.  *Baker Decl.*
Ex. 2 ¶ 2(c)(A); *Winters Decl.* Ex. 2 ¶2(c)(A).  The liquidated damages formula, however,
requires the parties to use the VWAP from the date of exercise, or March 5, 2015, when
calculating damages.  Paragraph 2(d)(i) states that ECIG "shall pay to the Holder, in cash, as
liquidated damages . . . for each $1,000 of Warrant Shares subject to such exercise (based on the
VWAP of the Common Stock *on the date of the applicable Notice of Exercise*), $10 per Trading
Day (increasing to $20 per Trading Day on the fifth Trading Day after such liquidated damages
begin to accrue) for each Trading Day after such Warrant Share Delivery Date until such
Warrant Shares are delivered . . . ."  *Baker Decl.* Ex. 2 ¶ 2(d)(i); *Winters Decl.* Ex. 2 ¶ 2(d)(i)
(emphasis added).  Notably, the Declarations of Baker and Winters, when setting forth the
liquidated damages formula, omit the VWAP date to be employed in the calculation by replacing
the date with an ellipsis.  *Winters Decl.* ¶ 5; *Baker Decl.* ¶5.  The only conclusion can be that
Plaintiffs deliberately omitted that portion of § 2(d)(i) which defines the applicable VWAP date
as the exercise date because the correct VWAP substantially reduces their damages and, in any
case, they failed to submit evidence of the VWAP as of the exercise date of March 5, 2015.

The VWAP on the day before the date of exercise, March 4, 2015, on an adjusted basis
was $2.7210.  *Anderson Decl.* Ex. H.  The VWAP on the date of the exercise, March 5, 2015, on
an adjusted basis, was $2.0346.  *Anderson Decl.* Ex. H.  Both the March 4 and the March 5, 2015
VWAPs have been adjusted because ECIG completed the 15:1 Reverse Split on March 24, 2015.

*Anderson Decl.* ¶ 46; *Anderson Decl.* Ex. I.  Because the 15:1 Reverse Split was not in effect on March 4 or 5, the VWAP must be divided by fifteen to determine the actual VWAP as of the respective dates before being applied to the liquidated damages formula.  *Anderson Decl.* ¶ 47. Thus, the applicable VWAP as of March 4, 2015 under the cashless exercise clause is $.1814. *Id.*  The applicable VWAP as of March 5, 2015 under the liquidated damages clause is .13564. *Id.*  When the proper number of shares and the correct VWAP are applied to the liquidated damages formula, Plaintiffs' damages significantly shrink.

> <u>Total Liquidated Damages due BME:</u> $280,339.80
> Calculated using the formula in Section 2(d)(i) of the warrants:
>
> [(12,157,606  Warrant Shares) * (VWAP of .13564) * (5 days) *
> (1%)] + [(12,157,606  Warrant Shares) * (VWAP of .13564) *
> (6 days) * (2%)] = $280,339.80.
>
> <u>Total Liquidated Damages due Gemini:</u>  $200,086.67
> Calculated using the formula in Section 2(d)(i) of the warrants:
>
> [(8,677,237 Warrant Shares) * (VWAP of .13564) * (5 days) *
> (1%)] + [(8,677,237 Warrant Shares) * (VWAP of .13564) *
> (6 days) * (2%)] = $200,086.67
>
>
> At the most, Plaintiffs can recover a total of $480,426.47.

## CONCLUSION

For the reasons set forth above, Plaintiffs' motions should be denied and this case allowed to proceed.

Dated:   New York, New York
         October 21, 2015

                              ROBINSON BROG LEINWAND GREENE
                              GENOVESE & GLUCK PC

                              By:  ⋅  /s/ Lawrence S. Hirsh

                                   Lawrence S. Hirsh, Esq.
                                   875 Third Avenue
                                   New York, New York 10022
                                   212-603-6300 Phone
                                   212-956-2164 Fax
                                   lhirsh@robinsonbrog.com