UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

GEMINI MASTER FUND, LTD. AND             No. 15-cv-3378 (WHP)
BLACK MOUNTAIN EQUITIES, INC.,

                              Plaintiffs,

                    -against-

ELECTRONIC CIGARETTES
INTERNATIONAL GROUP, LTD,

                              Defendant.

## DECLARATION OF PHIL ANDERSON
## IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT

PHIL ANDERSON, declares under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1.      I am the Chief Financial Officer ("CFO") of defendant Electronic Cigarettes International Group, LTD ("ECIG"), a publicly traded manufacturer of electronic cigarettes.

2.      As CFO of ECIG, I have personal knowledge of ECIG's dealings with plaintiffs Gemini Master Fund, LTD. ("Gemini") and Black Mountain Equities, Inc. ('BME") (jointly, "Plaintiffs") and of the ECIG's finances, including its outstanding warrants, shares, operational plans, and strategic planning.

## INTRODUCTION

3.      Plaintiffs and I have a fundamentally different recollection of our interactions.  I spoke to the principals of the Plaintiffs on February 18, 2015 for about half an hour (the "Call").  During that Call, Plaintiffs asked questions as part of their "due diligence" in connection with their potential acquisition of ECIG warrants on the secondary market.  During the Call, I answered Plaintiffs' questions concerning: (i) ECIG's financial condition, including when ECIG would have shares available to deliver upon the exercise of its warrants; and (ii) what other

ECIG investment opportunities were currently available to Plaintiffs. In their recent depositions in this case, taken after they filed their motion, which I have reviewed, Plaintiffs described our Call totally inaccurately. For example, in contrast to my clear recollection, they claim the Call lasted no more than a few minutes rather than a half hour and that the sole topic of conversation was the reissue of warrants they had already purchased. They deny that I told them about a restructuring of ECIG that I was then negotiating and which I clearly recall telling them about in response to their questions. It is hard to imagine how they could claim they are entitled to summary judgment when we have such fundamentally different recollections of the Call and the information Plaintiffs became privy to, which impacts their claim that they are entitled to liquidated damages for the short delay in delivery of shares upon the exercise of their warrants.

## BACKGROUND

4.      In order to shed light on the actual content of the Call, including why I provided them information about the ongoing restructuring in response to their questions, it is important to place the Call in context. To that end, a short background explanation of ECIG's financial condition during the end of 2014 and the first quarter of 2015 is necessary.

5.      During the fourth quarter of 2014, ECIG faced certain financial difficulties arising from a number of sources, including issues concerning its capital structure. It quickly became apparent that ECIG required a large capital infusion to stay afloat.

6.      That being the case, ECIG sought to recapitalize its balance sheet by soliciting substantial investments from outside sources (the "Recapitalization"), including from a private equity firm called Metropolitan Equity Partners ("Metropolitan"). While the terms of this agreement were being negotiated, ECIG also obtained certain bridge loans from other investors in order to provide necessary capital. In particular, during early 2015, ECIG was negotiating a

bridge loan from an investment firm called Calm Waters Partnership ("Calm Waters") (the "Bridge Loan"). The Bridge Loan was disclosed on or about March 4, 2015 via filing of a form 8-K.

7.      On January 19, 2015, ECIG executed a term sheet pursuant to which Metropolitan agreed to loan ECIG $28,000,000.00 at 12% interest, to recapitalize ECIG's balance sheet. The loan was to be secured by a first priority perfected security interest in all of the stock and assets of ECIG. A true and accurate copy of the Metropolitan term sheet is attached hereto as Exhibit A. Although ECIG executed the term sheet, it continued courting other potential investors as well, and the Recapitalization was primarily funded by Calm Waters.

8.      As a condition to the Recapitalization, ECIG was required to negotiate the elimination of "ratchet" and other anti-dilution clauses from extant warrants. To this end, I began contacting all of the existing warrant holders to negotiate amendments to their warrants to remove the ratchet and anti-dilution provisions.

9.       Generally, an anti-dilution clause provides the holder of an option or convertible security, such as a warrant, the right to maintain its percentage ownership of a company should the company issue securities in the future.

10.      A ratchet protects a warrant holder by adjusting the price at which the investor is entitled to purchase shares from the issuer in the event of a subsequent issuance of additional stock. The ratchet applies the lowest sale price of the issuer's stock as the adjusted option price or conversion ratio, essentially enabling the holder to obtain more stock for a lower price. For example, if a holder was initially required to pay $2.00 per share upon conversion of the warrant, and subsequently the issuer issued additional stock to a new investor at a price of $1.00 per share, the original holder would be entitled to exercise its warrant at the price of $1.00 per share.

11.     In most cases, I was able to negotiate the elimination ratchet and anti-dilution clauses with ECIG's warrant holders in consideration of a perpetual cashless exercise option.

12.     A cashless exercise permits the warrant holder to "pay" for the shares it will receive under the warrant by permitting the issuer to cancel some of the shares exercised.  The number of shares to be canceled by the issuer is determined by application of a formula in the warrant.  For example, suppose a holder is entitled to 100 shares of common stock under a warrant and decides to acquire its shares by a cashless exercise.  Suppose further that under the warrant's cashless exercise formula that the holder is required to "pay" the issuer the equivalent of 20 shares of stock to obtain its 100 shares.  Under this scenario, the issuer would retain 20 shares and the holder would receive 80 shares.  In effect, the holder has "paid" the issuer by permitting it to cancel 20 of its own shares, the consideration being "cashless."

13.     While the Recapitalization was under negotiation, ECIG's stock was in a "death spiral."   A death spiral occurs when an issuer's stock suffers a large loss in value.  As a result of the loss in value, when warrant holders exercise their rights, the issuer is required to issue more shares than it anticipated.  The issuance of additional shares causes the issuer's stock to become diluted and therefore lose additional value.  The falling price of the shares often causes additional warrant holders to exercise their warrants before the shares depreciate further.  The issuer then issues more shares causing further dilution.  In this "positive feedback" cycle, the issuer quickly runs out of authorized shares to issue.

14.     ECIG's stock was in a death spiral for multiple reasons.  First and foremost, a failed public offering in the fourth quarter of 2014 seriously injured the value of ECIG's stock.  After the failed public offering, ECIG's stock price declined, in large measure, due to the fact that ECIG had many outstanding warrants and convertible bonds that contained provisions that

adjusted the conversion price as the price of ECIG's stock dropped to below-market rates.  As the price of ECIG's stock dropped and the warrant holders and convertible bond holders continued to convert their warrants at ever more favorable conversion terms, ECIG was forced to issue far more of its authorized shares than it ever anticipated.  Consequently, ECIG soon lacked the necessary number of authorized shares to satisfy the warrants that remained outstanding.

15.     I have reviewed Plaintiffs' motion for summary judgment.  One of Plaintiffs' arguments is that ECIG had ample shares to honor the exercise of Plaintiffs' warrants but elected not to do so in a timely manner.  This is incorrect.  As I told Plaintiffs representatives during the Call, we did not have sufficient shares.  Plaintiffs argue that ECIG's January 26, 2015 Proxy Statement calling for a special meeting of stockholders on March 10, 2015 for shareholders to approve (i) a reverse stock split; and (ii) an increase of authorized shares, shows that ECIG had 53,601,332 shares available to satisfy Plaintiffs' warrants..  *Declaration of Thomas Fleming*, dated August 28, 2015, Ex. 1 at 1.  While this was true at the time the January 26, 2015 Proxy Statement was filed, by the time Plaintiffs purchased their warrants, intervening events had significantly changed the amount of unissued authorized stock ECIG possessed.  In effect, the death spiral resulted in ECIG issuing all but 1,031,349 shares of its authorized 300,000,000 shares common stock as of February 18, 2015.  A true and accurate copy of the transfer agent's report on issued authorized shares of ECIG is attached hereto as Exhibit B.  Indeed, as detailed below, I explicitly informed Plaintiffs that ECIG could not fulfill the terms of the Warrant.

16.     Because ECIG knew it was in a death spiral and could not meet its ongoing obligations under the outstanding warrants, it issued the January 26, 2015 Proxy Statement to begin the process of obtaining the necessary authorizations for: (i) a reverse stock split that was

eventually approved at a ratio of 15:1 (the "Reverse Split"); and (ii) an additional 50 million shares of stock (the "Additional Authorization").

## INITIAL COMMUNICATIONS WITH PLAINTIFFS

17.     I had never heard of Gemini or BME until I received a February 17, 2015 e-mail from Bradley Richmond, the Managing Director of Newport Coast Securities Inc., a holder of ECIG warrants.  In his e-mail, Richmond informed me that Adam Baker ("Baker") of BME wanted to ask me questions before purchasing certain outstanding warrants, which are the subject of this litigation.  A true and accurate copy of the e-mail is attached hereto as Exhibit C.

18.     On February 18, 2015, I received the Call from Baker, who had Steven Winters ("Winters") of Gemini with him on the telephone.  A true and accurate copy of an e-mail between me and Winters confirming our February 18, 2015 conversation occurred is attached hereto as Exhibit D.

19.     During the Call, Baker and Winters informed me they were about to purchase ECIG warrants on the secondary market and were performing due diligence.  I fielded various questions from Baker and Winters, including: (i) when ECIG would have shares available to meet its warrant obligations; and (ii) what other investment opportunities ECIG could currently offer them.

20.     I have reviewed the deposition testimony of Bakers and Winters.  I strongly disagree with their recollection of the content of the Call.  True copies of the deposition transcripts are attached to the Declaration of one of our attorneys, Lawrence S. Hirsh, dated October 21, 2015  ("*Hirsh Decl.*").  Some examples of my disagreement with their version of what happened on the Call are as follows:

6

      a.      Winters states that the purpose of the Call was to request that ECIG reissue the warrants in Plaintiffs' names after the warrants had been purchased.  *Hirsh Decl.* Ex. A at 31:15-25.  Baker concurs with Winters.  *Hirsh Decl.* Ex. B at 34:16-22.  Plaintiffs actually informed me that the purpose of the Call was to perform due diligence before they purchased the warrants.

      b.      Winters testified that he does not recall discussing anything other than the reissue of the warrants in the name of Gemini.  *Hirsh Decl.* Ex. A at 33:20-24.  Baker agreed. *Hirsh Decl.* Ex. B at 35:2-10.  As I explain further below, I discussed many other topics with Plaintiffs, including the then ongoing Recapitalization.

      c.      Winters testified that the Call lasted "five or ten minutes."  *Hirsh Decl.* Ex. A at 33:25-34:3-9.  Baker estimated the call to have lasted between two and twelve minutes. *Hirsh Decl.* Ex. B at 34:12-15.  To the best of my recollection, we spoke for at least thirty minutes.

21.      Winters led the Call, although Baker also participated.  I provided information to Baker and Winters about the Company's Recapitalization plans, which I thought Baker and Winters understood from their long experience as professional investors was confidential and material nonpublic information.  They knew it had not yet been disclosed publicly.

22.      Based on Exhibit C, I knew that some of the warrants Gemini and BME sought to acquire would be purchased from Richmond and Newport.  Immediately prior to the Call, I was still attempting to negotiate the elimination of the ratchets and anti-dilution provisions in ECIG's outstanding warrants, including with Newport.  Therefore, I asked Plaintiffs whether they would consider relinquishing the ratchet and other anti-dilution provisions in the warrants they were about to acquire in consideration of the right to a perpetual cashless exercise.  Winters and Baker

declined on grounds that the warrants they were considering purchasing already contained the right to a perpetual cashless exercise. Winters claimed not to recall this conversation. *Hirsh Decl.* Ex. A at 34:23-354, as did Baker. *Hirsh Decl.* Ex. B at 39:16-20.

23. Winters inquired when the Reverse Split and Additional Authorization would be complete, reflecting that Plaintiffs were aware of ECIG's inability to issue shares as required by the warrants. I informed Winters that the authorization process was ongoing and that, until such time as the Reverse Stock Split and Additional Authorization were completed, ECIG would not be able to fulfill the terms of the warrants in the event of exercise because it lacked sufficient authorized shares. Winters claims I never mentioned ECIG's inability to fulfill the terms of the warrants. *Hirsh Decl.* Ex. A at 39:3-16. Baker had no recollection of this discussion either. *Hirsh Decl.* Ex. B at 40:18-22.

24. In response, Winters informed me that ECIG's inability to issue the necessary shares was irrelevant to him because Gemini and BME intended to hold the warrants and "trade on their volatility." I informed Winters and Baker that this was impossible because the warrants were not publicly traded. Winters told me, "don't worry about it, we know how to do it" and reiterated that ECIG's inability to issue sufficient shares was not an issue because Plaintiffs merely intended to trade on the warrants' volatility. I understood from those statements that Gemini and BME were not going to exercise the warrants, at least prior to the completion of the Reverse Stock Split and Additional Authorization. Baker denied that Plaintiffs ever stated they merely intended to trade on the volatility of the warrants. *Hirsh Decl.* Ex. B at 40:14-17.

25. Winters then inquired about the possibility of Plaintiffs making additional capital investments in the Company, including purchasing ECIG's senior secured debt and additional

warrants.  Baker does not recall inquiring into the possibility of additional investments.  *Hirsh Decl.* Ex. B at 40-18-22.

26.     In response to Winters's inquiry, I informed him that I would be happy to put them in touch with certain other investors, which were seeking to sell ECIG's senior secured debt or warrants.  I further noted that Winters and Baker had called at an opportune time because ECIG was in the midst of the Recapitalization and had significant investing opportunities available.  Indeed, I informed them that the reason that ECIG was seeking to remove the ratchet and anti-dilution clauses from the warrants was because it was required to do so based upon the terms of the Recapitalization.

27.     Winters proceeded to ask me for more information about the Recapitalization.  I responded that the Recapitalization involved the recapitalization of ECIG's entire balance sheet, and that it would involve a senior secured loan generating 12% interest, payable in cash to the investors, and that any warrant coverage to be provided to the investors was still to be determined.   Winters, not surprisingly, claims that none of the terms of the Recapitalization were ever discussed.  *Hirsh Decl.* Ex. A at 41:21-24.

28.     The facts I disclosed about Recapitalization were obviously material and non-public.  I only divulged the information to Plaintiffs because I understood, and I believe Winters and Baker understood, that they were being brought "over the wall," meaning that the information was not public and that Plaintiffs would not be able to sell any ECIG shares until the information about the Recapitalization was disclosed to the market.

29.     I disclosed the Recapitalization information to Plaintiffs solely because they are industry professionals that expressed an apparently genuine interest in investing in ECIG.  I would never have disclosed such information to any individual or entity that was not interested

in investing in ECIG, nor would I have disclosed this information if I did not believe that Winters and Baker knew that they could not trade ECIG shares until the information became public.  Of course, I had no reason to think that Winters and Baker had any intention of trading ECIG shares before the information would become public because I had already told them during the Call that the warrants they intended to acquire could not be converted to shares until such time as the Recapitalization was completed and they had responded that they had no intention of selling shares because they merely intended to trade on volatility of the warrants.

30.     I fully expected the entirety of the Call, as well as the particulars of the Recapitalization, to be maintained by Plaintiffs as confidential.  Since Winters made the explicit representation that Plaintiffs had no intention of trading ECIG's shares, I understood this representation to be an implicit agreement by Plaintiffs not to trade ECIG shares until the information became public.

31.     The phone call ended after approximately thirty minutes on good terms, and Winters and Baker suggested that we get together when they were in New York.

## SUBSEQUENT INTERACTIONS WITH PLAINTIFFS

32.     Winters and Baker contacted me again via e-mail on March 4, 2015, and proposed a "compromise" to eliminate the warrants' ratchets we had discussed during the Call, and to address ECIG's inability to issue sufficient shares as a result of an increasing VWAP.  A true and accurate copy of Winters' March 4, 2015 e-mail is attached hereto as Exhibit E.

33.     Plaintiffs exercised their warrants on March 5, 2015.

34.     Needless to say, I was surprised by Plaintiffs' decision to exercise the warrants given their previous representations that they did not intend to do so.

35.     Naturally, as I had informed Plaintiffs, ECIG was not able to timely issue Plaintiffs sufficient shares as required by the warrants, because ECIG's death spiral had caused it to run out of all its authorized shares and the Reverse Split and Additional Authorization had not been completed.

36.     ECIG worked feverishly to complete the Reverse Split and the Additional Authorization so it could fulfill the terms of the warrants.  Ultimately, the Reverse Split was approved at a ratio of 15:1, although the Additional Authorization was rejected.  A true and accurate copy of the proxy material filed by ECIG with respect to the Reverse Split and Additional Authorization is attached hereto as Exhibit F.

37.     ECIG eventually issued to Plaintiffs all of the shares required on March 26, 2015.

## COMPLETION OF THE RECAPITALIZATION

38.     Eventually, Calm Waters and ECIG consummated the Recapitalization on terms nearly identical to those we had negotiated with Metropolitan although ECIG borrowed more, totaling $35 million after fees.

39.     The April 27, 2015 Recapitalization was disclosed by the public filing of an 8-K on May 1, 2015.  A true and accurate copy of the May 1, 2015 8-K is attached hereto as Exhibit G.

40.     Thus, the Recapitalization that was disclosed to Winters and Baker was not publicly announced until well over one month after the March 10, 2015 date on which Plaintiffs claim they were entitled to receive their shares.  For that reason they could not have sold their shares prior to the May 1, 2015 announcement of the Recapitalization and they suffered no harm by the fact that the shares were not delivered to them until March 26, 2015.

## PLAINTIFFS CALCULATED LIQUIDATED DAMAGES INCORRECTLY UNDER THE WARRANTS

41.     My review of Plaintiffs' motion has led me to conclude that, at the very least, Plaintiffs' liquidated damages calculation is flawed.

42.     Plaintiffs base their calculation on the incorrect assumption that they are entitled to liquidated damages on shares they would never receive.  That is, BME claims that it is entitled to collect damages on 14,051,543 shares, despite the fact that it was entitled to receive, after the cashless exercise, only 12,157,606 shares.  *Baker Decl.* ¶¶ 6-7.  Gemini claims that it is entitled to collect damages on 10,029,099 shares, despite the fact that it was entitled to receive, after the cashless exercise, only 8,677,327 shares.  *Winters Decl.* ¶¶ 6-7.  Plaintiffs are simply not entitled to damages on shares they never would have received.

43.     Furthermore, Plaintiffs' calculation incorrectly utilizes a VWAP of $.1814 from March 4, 2015.  *Winters Decl.* Ex. 3; *Baker Decl.* Ex. 3.  Pursuant to the warrants' liquidated damages calculation, however, the issuer must pay liquidated damages "based on the VWAP of the Common Stock on the date of the applicable Notice of Exercise . . . ."  *Winters Decl.* Ex. 2 at ¶ 2(d)(i); *Baker Decl.* Ex. 2 at ¶ 2(d)(i).   The date of the Notice of Exercise is March 5, 2015, not March 4.  *Winters Decl.* Ex. 3; *Baker Decl.* Ex. 3.

44.     The VWAP report submitted by Plaintiffs does not contain a VWAP for March 5, 2015.  Indeed, Plaintiffs have not submitted any evidence of the March 5 VWAP.

45.     A true and accurate copy of a VWAP report containing the March 5, 2015 VWAP is attached hereto as Exhibit H.

46.     Exhibit H contains a chart listing VWAPs on an adjusted basis.  The VWAPs listed in Exhibit H are presented on an adjusted basis to take into account ECIG's 15:1 Reverse Split, which came into effect as of March 24, 2015.  A true and accurate copy of ECIG's March 24, 2015 8-K and accompanying Certificate of Amendment to ECIG's Articles of Incorporation

is attached hereto as Exhibit I.  Exhibit I demonstrates that the Reverse Split actually occurred and, as a result, that the VWAPs listed in Exhibit H must be adjusted downward to account for the fact that the Reverse Split had not occurred as of March 4 and March 5.

47.     Exhibit H indicates a VWAP of $2.7210 on March 4, 2015 and a VWAP of $2.0346 for March 5, 2015.  Because ECIG completed the 15:1 Reverse Split as of March 24, 2015, these VWAPs must be adjusted to account for the Reverse Split which was not in effect on March 4 or 5.  In other words, each day's VWAP must be divided by fifteen before it is accurate. The March 4, 2015 VWAP of $2.7210, after being divided by fifteen, is $.1814.  The March 5, 2015 VWAP of $2.0346, after being divided by fifteen, is $.13564.

48.     As noted, the date of the Notice of Exercise is March 5, 2015.  *Winters Decl.* Ex. 3; *Baker Decl.* Ex. 3.  Therefore, the VWAP of $.13564 should be employed when calculating Plaintiffs' damages, if any.

49.     After performing the liquidated damages calculation on the correct number of shares with the proper VWAP, Plaintiffs' alleged damages are substantially reduced as follows:

Total Liquidated Damages due BME: $280,339.80
Calculated using the formula in Section 2(d)(i) of the warrants:

[(12,157,606  Warrant Shares) * (VWAP of .13564) * (5 days) * (1%)] + [(12,157,606  Warrant Shares) * (VWAP of .13564) * (6 days) * (2%)] = $280,339.80.

Total Liquidated Damages due Gemini:  $200,086.67
Calculated using the formula in Section 2(d)(i) of the warrants:

[(8,677,237 Warrant Shares) * (VWAP of .13564) * (5 days) * (1%)] + [(8,677,237 Warrant Shares) * (VWAP of .13564) * (6 days) * (2%)] = $200,086.67

50.     At the most, Plaintiffs can recover a total of $480,426.47.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated:   New York, New York
         October 21, 2015

                                         _____

                                         **Phil Anderson**